**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

*(Electronically Filed)*

| | |
|---|---|
| FRANKLIN ELDRIDGE, individually and on behalf of all others similarly situated, | |
| *Plaintiff*, | CASE NO. 3:16-CV-536-DJH |
| *v.* | Judge David J. Hale |
| CABELA'S INCORPORATED, a Delaware corporation, | |
| *Defendant.* | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO CABELA'S MOTION TO DISMISS
PLAINTIFF'S COMPLAINT AND TO STRIKE CLASS ALLEGATIONS (DN 20)**

## I.   INTRODUCTION

In an effort to collect outstanding debts on its "Cabela's CLUB Visa credit card",

Defendant Cabela's Incorporated ("Defendant" or "Cabela's")—through a wholly-owned bank

subsidiary, World's Foremost Bank ("WFB"), which acts on Cabela's behalf—places telephone

calls using an automatic telephone dialing system ("ATDS") to consumers nationwide without

the consumers' prior express consent. Specifically, Cabela's fails to institute safeguards to avoid

calling recycled phone numbers—numbers that used to be assigned to a different user, which are

then reassigned to a new user when the old customer gets a different phone number. The calls

even persist after consumers request that the calls stop, like Plaintiff Franklin Eldridge

("Plaintiff" or "Eldridge") did.

This violates the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*

That is, it is unlawful to make calls using an ATDS and/or with a pre-recorded voice without

obtaining prior express consent or after any supposed consent has been revoked. Yet rather than acknowledge its unlawful conduct—let alone take steps to stop its harassing calls—Cabela's seeks dismissal on the pleadings, asserting that: (1) it is not liable for calls made by WFB, (2) the Complaint fails to sufficiently allege an agency relationship between Cabela's and WFB, and (3) that Plaintiff hasn't alleged a concrete injury to confer standing under the Supreme Court's decision in *Spokeo v. Robins*, 136 S. Ct. 1540 (May 16, 2016). Defendant further seeks to strike Plaintiff's class allegations.

Fortunately for the hundreds (and perhaps thousands) of cellphone users who have been bombarded by Cabela's calls, Defendant's Motion to Dismiss and to Strike lacks merit and should be denied. The Complaint sets forth sufficient facts to show that Cabela's or its agent used ATDS and/or a pre-recorded voice, that Plaintiff provided no prior express consent to receive the calls, that Cabela's fails to institute safeguards to avoid calling reassigned or recycled numbers, and that Eldridge received multiple calls despite requesting that Cabela's stop calling him. As such, Eldridge details facts to satisfy the elements of his TCPA claim to avoid dismissal on the pleadings.

Furthermore, and while much is unknown at this stage of the case about the precise relationship between Cabela's and WFB, it is clear that WFB is a wholly-owned subsidiary that Cabela's uses to issue and manage the Cabela's CLUB Visa credit card. Likewise, the Complaint provides detailed facts regarding Cabela's involvement in the phone calls so that it may be held liable under an agency theory for any calls that WFB placed on its behalf.  In addition, Cabela's overlooks its alleged ratification of the calls, which were undoubtedly made for its benefit and with its knowledge. Moreover, courts throughout the country have found standing post-*Spokeo* in similar TCPA cases and striking the class allegations is both premature and unwarranted.

Accordingly, and as explained more fully below, the Court should deny Defendant's Motion to Dismiss and to Strike and allow the case to proceed past the pleadings stage.

## II.    STATEMENT OF FACTS

Cabela's is a corporation headquartered in Sidney, Nebraska that sells sporting goods and outdoor equipment, such as fishing and hunting gear. (Compl., DN 1, ¶ 1.) Cabela's—which operates 77 retail stores in 36 states—is the world's largest direct marketer of hunting, fishing, camping and related outdoor merchandise. (*Id.* ¶¶ 10, 11.)

Cabela's, through a wholly-owned subsidiary, WFB, issues and manages the "Cabela's CLUB Visa credit card," a rewards-based credit card program. (*Id.* ¶ 12.) As of 2015, there were 1.9 million active Cabela's CLUB Visa credit card holders. (*Id.* ¶ 13.) Cabela's markets the CLUB Visa credit card on its own website—consumers may obtain the card directly from Cabela's website and are not re-routed to any separate WFB website when applying. (*See* Screenshots of Cabela's Website and Application, collectively attached hereto as Group Exhibit A.) Moreover, Cabela's admits in its SEC forms that, with respect to the CLUB Visa credit card's collection and recovery process, "**[w]e** employ a 'cradle to grave' collection approach . . . **[w]e** employ an autodialer". (Compl., DN 1, ¶ 15) (Emphasis added).

As part of its collection efforts, Cabela's places calls to consumers on their cellular phones even when they have no relationship with Cabela's. (*Id.*, ¶ 18.) Specifically, as in Plaintiff's case, Cabela's places autodialed and pre-recorded calls to owners of recycled numbers (many of whom have no relationship with Cabela's at all) who have not consented to receiving such calls. (*Id.*) On some of the calls at issue, the caller expressly identifies "Cabela's" as being the maker of the calls. (*Id.* ¶¶ 23, 32.)

For various reasons, cellular telephone subscribers deactivate and relinquish their cellular telephone numbers and, once deactivated, the cellular telephone carrier reassigns the number to another subscriber—a practice known as "recycling". (*Id*.) In some instances, the prior owner of a recycled telephone number may have consented to receiving autodialed and/or recorded calls from companies such as Cabela's, but that consent does not transfer to the recycled cellular number's owner. (*Id*. ¶ 19.)

For this reason, a wealth of industry guidelines and commercially available resources help companies identify recycled numbers so that they cease calling them. (*Id*. ¶¶ 20-22.) But Cabela's doesn't follow the guidance or employ such resources to avoid calling recycled numbers—rather, it simply treats the new recycled telephone number owner as if he or she were the previous owner. (*Id*. ¶ 23.)

In Plaintiff Eldridge's case, he obtained a new cellular telephone number from Cricket Wireless in or around February 2016. (*Id*. ¶ 32.) Shortly thereafter, Plaintiff began receiving autodialed and prerecorded calls to his new phone from Cabela's. Plaintiff is not a customer and never provided consent to be called. Yet Cabela's called him endlessly in an attempt to collect an outstanding debt from a person named Jonathan Reed, presumably the prior owner of Plaintiff's cellular telephone number. (*Id*. ¶¶ 32, 34.)

Plaintiff Eldridge was bombarded with such calls, receiving approximately 5-10 such calls per week. (*Id*. ¶ 33.) On the occasions when Plaintiff answered the calls, he often heard a pre-recorded message. Other times, the calls are silent and then disconnected, which is a tell-tale sign that the call was placed using an ATDS. (*Id*. ¶ 34.) Starting in February 2016, Plaintiff began repeatedly asking Cabela's to stop calling him and explaining (on at least 3 occasions) that he was not the person they were seeking—but the calls continued. (*Id*. ¶ 38.)

As explained below, and notwithstanding Cabela's strident assertions to the contrary, these facts state a claim against Cabela's for violating the TCPA and for Plaintiff's class claims to proceed to discovery, and the Court should refuse to allow Cabela's to escape liability on the pleadings.

### III.   **ARGUMENT**

On a motion to dismiss, the Court accepts all allegations as true, and draws reasonable inferences in favor of the plaintiff.  *See Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  While federal pleading standards require more than "formulaic recitation of the elements" of a claim or "naked assertions," a complaint survives dismissal where it allows the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555-57 (2007)). To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that "state a claim to relief that is plausible on its face," and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 570. "A claim is plausible on its face if the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 369 (6th Cir. 2011) (quotations omitted).

Cabela's Motion to Dismiss and to Strike fails. As explained below, Cabela's may be held liable for calls made by its subsidiary agent WFB, the Complaint sufficiently alleges an agency relationship between Cabela's and WFB, Eldridge received the calls and has standing, and striking the class allegations is premature. Cabela's arguments misconstrue both the law and the allegations, and discovery will ultimately prove that Cabela's violated the TCPA.

**A.      The Law Is Clear: Cabela's May Be Held Liable Under the TCPA For Calls Made By Its Subsidiary Agent WFB.**

Defendant's first attack is that only the person or entity who actually placed the calls at issue may be liable under the TCPA. (Mot. at 6.) This is wrong on the law. "The FCC has explained that vicarious liability [in the context of the TCPA] may be predicated upon federal common law agency principles." *Shamblin v. Obama for Am.*, No. 8:13-CV-2428-T-33TBM, 2015 WL 1754628, at *6 (M.D. Fla. Apr. 17, 2015) (*citing In re Dish Network*, 28 FCC Rcd. 6582–83 ¶¶ 24–26). Indeed:

> [s]uch principles include classical agency (where a principal manifests assent that an agent shall act on the principal's behalf and subject to the principal's control); apparent authority (where the principal is accountable for the results of a third-party's belief about the actor's authority to act as an agent when the belief is reasonable and traceable to a manifestation of the principal); and ratification (when a principal knowingly accepts the benefits of the actor's conduct). *Id.* at 6586–87.

*Shamblin*, No. 8:13-CV-2428-T-33TBM, 2015 WL 1754628, at *6; *see also Toney v. Quality Res., Inc.*, No. 13 CV 42, 2014 WL 6757978, at *10 (N.D. Ill. Dec. 1, 2014) (explaining that principals may have vicarious liability for TCPA violations "under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification"). "Apparent authority arises in those situations where the principal causes persons with whom the agent deals to reasonably believe that the agent has authority' despite the absence of an actual agency relationship." *American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.* 42 F.3d 1421, 1439 (3d Cir. 1994) (*citing Barticheck v. Fidelity Union Bank/First Nat'l State*, 680 F.Supp. 144, 148-149 (D.N.J. 1988)); *see also Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT*, 106 F.Supp.2d 606, 617 (D.N.J. 1999) (explaining apparent authority).

The FCC has rejected the idea that consumers need to show, in their initial pleadings, that a seller is vicariously liable for offending calls. *See In re Dish Network*, 28 FCC Rcd. at 6584 ¶ 28 ("In the case of either actions to enforce section 227(b) or actions to enforce do-not-call restrictions under section 227(c), ***we stress that nothing in this order requires a consumer to provide proof – at the time it files its complaint – that the seller should be held vicariously liable for the offending call."*) (Emphasis added.)

As such, as a preliminary matter the Court can (and should) deny Cabela's Motion to the extent it is premised on the notion that vicarious liability under the TCPA is unavailable as a matter of law. That is simply inaccurate. Further, and as set forth below, the Court should find that the Complaint sets forth sufficient facts to show that WFB acted as Cabela's agent here.

### B.     The Complaint Sets Forth Facts That, If Proven, Show That WFB Acted As Defendant's Agent For The Purpose Of Making The Calls.

Defendant's second argument—that the Complaint doesn't set forth sufficient facts to show that WFB acted as its agent when making the calls (Mot. at 6-8)—also falls apart. That is, although Defendant asserts that, "the Complaint fails to allege any facts that would establish an agency relationship between Cabela's (the entity Plaintiff sued) and WFB (the entity that Plaintiff contends called him) or that WFB acted with the apparent authority of its parent," (*id*. at 7) in reality just the opposite is true.

### 1.     The Complaint pleads facts to plausibly show that WFB had actual authority to make calls on behalf of Cabela's

Agency is a "relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01 (2006). "An essential element of agency is the principal's right to

control the agent's actions." *Id*, cmt. f(1) (2006). In particular, "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Toney*, 2014 WL 6757978, at *10; *see also Brooks v. Grams, Inc.*, 289 S.W.3d 208, 212 (Ky. App. 2008) ("The right to control is considered the most critical element in determining the principal's liability for the tortious acts of an agent").

In this case, the Complaint establishes that WFB plausibly had actual authority to act as the agent of Cabela's. The relationship between WFB and Cabela's is extensive—again, WFB is a wholly-owned subsidiary of Cabela's established to issue and manage the Cabela's CLUB Visa credit card. Cabela's markets the CLUB Visa credit card on its website and consumers may apply for the card directly from Cabela's—consumers are not re-routed to a website for WFB. And again, on its SEC Forms, Cabela's Incorporated discusses its CLUB Visa credit card's collection and recovery process by stating "**[w]e** employ a 'cradle to grave' collection approach . . . **[w]e** employ an autodialer". (Compl., DN 1, ¶ 15) (Emphasis added). The use of the pronoun "we" in this context makes clear that Cabela's maintains an active role in the collection and recovery process for the CLUB Visa credit card. Additionally, on some calls the caller identifies "Cabela's" as the maker of the call. (*Id*. ¶¶ 23, 32.)

The precise nature and extent of the relationship between WFB and Cabela's is unclear at this time. But it is entirely plausible—and likely—that Cabela's retains the ability to oversee and control WFB's activities with respect to the Cabela's CLUB Visa credit card. Discovery is needed to uncover the extent of Cabela's control and management over the calls WFB made. For now, the present facts and allegations Plaintiff pleads more than enough to survive a motion to dismiss. *See Toney*, 2014 WL 6757978, at *11 ("Plaintiff, however, alleges sufficient facts to

show that Sempris in fact exercised a level of control over Quality's telemarketing activities to make the existence of an agency relationship plausible.")

As such, actual authority is alleged, and the Court should deny the Motion to Dismiss.

### 2.      WFB plausibly had apparent authority to act as Defendant's agent.

"[A]pparent authority must derive from the statements or actions of the alleged principal, not the alleged agent." *Toney*, 2014 WL 6757978, at *11 (citing Restatement (Third) of Agency § 2.03 cmt. c (2006) ("An agent's success in misleading the third party as to the existence of actual authority does not itself make the principal accountable.")). "In other words, for apparent authority to exist, the principal 'must communicate either directly or indirectly with the third party' or take some action that instills in the third party a reasonable belief that the actor had authority to act as the principal's agent." *Id.* (citing *Bridgeview Health Care Ctr. Ltd. v. Clark*, No. 09 CV 5601, 2013 WL 4495221, at *3 (N.D. Ill. Aug. 21, 2013).

Applied here, Cabela's plausibly communicated *indirectly* with the third party—Plaintiff—by authorizing WFB to make the calls on its behalf to persons who Cabela's believed were delinquent on their Cabela's CLUB Visa cards. The operator on the calls did not say that the calls were for a debt owed to WFB. The FCC's illustrations in *In re Dish Network* of apparent authority-based agency relationships are instructive:

> For example, apparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on

> the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct. At a minimum, evidence of these kinds of relationships – which consumers may acquire through discovery, if they are not independently privy to such information – should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent.

*In re Dish Network*, 28 FCC Rcd. at 6584 ¶ 46. Discovery would almost certainly show that several of these illustrations are applicable here. WFB is alleged to issue and manage the Cabela's credit card product. Cabela's claims in SEC filings that "[w]e employ a 'cradle to grave' collection approach . . . [w]e employ an autodialer" (Compl., DN 1, ¶ 15), which speaks to an active role in the calls. WFB certainly had access to Cabela's systems and customer lists, including phone numbers and supposed debts owed. Indeed, even the Declaration of WFB Senior Vice President Douglas Huss (DN 20-2)("Huss Decl."), which Defendant attaches to its Motion, makes clear that the companies work together and are familiar with systems used by each company. (*See* Huss Decl. ¶ 3) ("I am familiar with the internal computer and information technology systems of WFB and those of Cabela's [] that are used to make records relating to calls made by Cabela's or WFB to customers, and calls received by Cabela's or WFB from customers."). Discovery may also reveal that Cabela's crafted the call scripts or controlled the messaging and, potentially, that it knew of the failure to properly filter recycled numbers yet failed to take corrective action. Put simply, the instant facts reflect the FCC's illustrations of apparent authority liability as well.

   Accordingly, the Court cannot conclude as a matter of law that WFB was not Cabela's agent on a theory of apparent authority. Discovery is needed as many of the necessary facts are peculiarly within Cabela's knowledge and control. Thus, WFB also plausibly acted as Cabela's agent with actual authority from Cabela's, and the Court should deny Cabela's Motion.

### 3.   Cabela's plausibly ratified the calls as well.

As a final matter here, it is also plausible that Cabela's ratified calls made by WFB. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01(1) (2006). A principal "is not bound by a ratification made without knowledge of material facts about the agent's act unless the principal chose to ratify with awareness that such knowledge was lacking." *Id.* § 4.01 cmt. b. "[K]nowing acceptance of the benefits of a transaction ratifies the act of entering into the transaction." *Id.* § 4.01 cmt. d.

Applied to the circumstances of this case, the "benefits" received by Cabela's by virtue of calls placed WFB on Cabela's behalf are <u>not</u> limited only to successful collection efforts—if so, a Cabela's could only ratify unlawful TCPA calls made on its behalf where the called party actually agreed to pay an outstanding balance. Rather, Cabela's gains the *potential* for collection—a benefit in and of itself—through the unlawful calls. If Cabela's knows the calls are being made unlawfully but does nothing to stop the calls, because with each call the chance of collecting increases, then under general ratification principles Cabela's has knowingly accepted the benefits produced by the calls.

Second, and related, restricting ratification only to cases where a called consumer also consummates a purchase applies ratification theory too narrowly—ignoring the principal's ability to ratify unlawful acts. That is, while ratification of a contract entered into by an agent without authority may require that the principal knowingly accept the benefits of the contract, in the tort context, "[t]hose who advise or consent to the unlawful acts, or subsequently ratify them, are liable as joint tort-feasors." *Broadmoor Apartments of Charleston v. Horwitz*, 306 S.C. 482, 486, 413 S.E.2d 9, 11 (S.C. 1991) (citing *Woodring v. Jennings State Bank,* 603 F.Supp. 1060

(D. Neb. 1985)); *Alexander v. Unification Church,* 634 F.2d 673 (2d Cir.1980); *Ingo v. Koch,* 127 F.2d 667 (2d Cir. 1942)). Indeed, ratification of an unlawful act can result in exemplary damages against the principal. *American Issue Pub. Co. v. Sloan*, 248 F. 251, 255 (6th Cir. 1917) ("subsequent approval or ratification by a corporation of the unlawful acts of even a subordinate agent makes it also liable in punitive damages") (citing *Press Pub. Co. v. Monroe*, 73 F. 196, 202 (2d Cir. 1896))*; see also Bolton v. Fed. Home Loan Mortgage Corp.*, No. 2:10CV171-WHA, 2010 WL 3270022, at *3 (M.D. Ala. Aug. 17, 2010) ("an employer can also be held liable for the unlawful acts of its employee if the employer ratifies those acts.") (quoting *Potts v. BE & K Constr. Co.,* 604 So.2d 398, 400 (Ala. 1992)). The principal's knowledge of the illegality is key—not its actual receipt of any benefits.  *See McNaughton v. Presbyterian Church of Coshocton Cnty.*, 35 Ohio App. 443, 447, 172 N.E. 561, 562 (1930) ("A corporation does not ratify unlawful acts of its officers, of which it has no knowledge"); *Gibson v. City of Clarksville, Tenn.*, 860 F. Supp. 450, 462-63 (M.D. Tenn. 1993) ("There must be some facts to show that such supervisory officers were involved in, and/or had knowledge of, the unlawful acts so as to ratify or acquiesce in them").

Applying these principals here demonstrates Defendant's plausible ratification of the unlawful calls made on its behalf by WFB. Again, WFB made calls for the sole purpose of collecting outstanding balances owed on Cabela's credit cards. Cabela's unquestionably knew this was occurring—it boasted of the collection practices in its SEC filings. Discovery will demonstrate the extent of its knowledge regarding the specific practices WFB used, including its procedures for honoring "stop calling" requests, and its procedures for ensuring recycled numbers weren't called. Likewise, discovery will show that Cabela's benefitted from every call that was placed—not simply the ones where an outstanding balance was collected.

Put simply, at this point it cannot be said that no facts can ever be shown that would demonstrate Cabela's ratified the calls. The Court should therefore deny Defendant's Motion.

**C.     An Overwhelming Majority Of Courts Analyzing Similar TCPA Cases Have Found Article III Standing Post-*Spokeo* And This Case Is Not Different**

For its next attack, Cabela's claims that as a result of the Supreme Court's recent decision in *Spokeo v. Robins*, Plaintiff lacks standing because, supposedly, "he has not alleged any concrete injury that is fairly traceable to any party's use of an ATDS or pre-recorded voice message".  (Mot. at 8.) This argument fails as well. An overwhelming number of Courts have held since *Spokeo* that violations of the TCPA cause concrete harm. Hence, and as explained further below, Defendant's Motion should be denied on this basis as well.

**1.     The *Spokeo* decision did not change the test for Article III standing**

First, it is important to put the *Spokeo* decision in context. "Article III of the United States Constitution limits the power of the courts to the resolution of actual 'Cases' and 'Controversies'." *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 969 (9th Cir. 2013). "The irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The first element—and the one at issue here—is that Plaintiff must have suffered "an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical". *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

*Spokeo* merely reiterated that the injury-in-fact test includes both concrete <u>and</u> particularized components—the case neither overruled precedent nor made new law. *Spokeo* did not even reverse the Ninth Circuit—it merely held that the Circuit Court had neglected to fully consider the concreteness of the plaintiff's injuries. Indeed, "[t]he Supreme Court handed down its decision in *Spokeo* on May 16, 2016, and in doing so, declined to decide the key standing

issue." *Errington v. Time Warner Cable Inc.*, No. 215CV02196RSWLDTB, 2016 WL 2930696, at *3 (C.D. Cal. May 18, 2016). As *Errington* explains:

> Rather, the Court threw out the Ninth Circuit's ruling in favor of the plaintiffs, reasoning that the Ninth Circuit's standing analysis was 'incomplete.' *Id*. at * 1. Justice Alito, writing on behalf of the majority, noted that the Court took "no position on the correctness of the Ninth Circuit's ultimate conclusion." *Id*. at *2. The Ninth Circuit's ruling was vacated and remanded for further analysis of the standing issue.

(*Id.*) Indeed, *Spokeo* was simply remanded back to the Ninth Circuit for a further analysis because "[t]he Ninth Circuit's analysis focused on the second characteristic [of an injury-in-fact analysis] (particularity), but it overlooked the first (concreteness). We therefore vacate the decision below and remand for the Ninth Circuit to consider *both* aspects of the injury-in-fact requirement." *Spokeo, Inc. v. Robins*, No. 13-1339, 2016 WL 2842447, at *3 (U.S. May 16, 2016) Thus, *Spokeo* did not upend Article III standing—it held that the Ninth Circuit simply conducted an incomplete analysis.

The *Spokeo* Court did articulate a reminder of general, previously established Article III standing principles. In discussing concrete injuries, the Court stated that "[a]lthough tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete." *Spokeo*, 136 U.S. at 549 (citing *Pleasant Grove City v. Summum,* 555 U.S. 460, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (free speech)); *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (free exercise)). Moreover, the Court reiterated that:

> in determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles. Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts. See *Vermont Agency of Natural Resources v. United States ex rel. Stevens,*

529 U.S. 765, 775–777, 120 S. Ct. 1858, 146 L.Ed.2d 836 (2000). In addition, because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important. Thus, we said in *Lujan* that Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." 504 U.S., at 578, 112 S. Ct. 2130. Similarly, Justice Kennedy's concurrence in that case explained that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id.,* at 580, 112 S. Ct. 2130 (opinion concurring in part and concurring in judgment).

*Spokeo*, 136 U.S. at 549.

Despite the defense bar's fervent attempt to paint *Spokeo* as a seismic shift in the law of standing, the fact is that none of the fundamentals discussed in *Spokeo* are new. *See Aranda v. Caribbean Cruise Line, Inc.*, 12 C 4069, 2016 WL 4439935 (N.D. Ill. Aug. 23, 2016) ("*Spokeo* was not the first case to set forth that an injury must be both concrete and particularized to suffice as an injury-in-fact for the purposes of constitutional standing . . . [i]ndeed, concreteness and particularity have been the twin pillars of a justiciable injury-in-fact for at least forty years"). "[T]he Court did not find that Robins's asserted injury was not concrete. Rather, the Court simply observed that the Ninth Circuit failed to consider the question adequately." *Id.* To be sure, the *Spokeo* Court's ultimate holding was "[w]e take no position as to whether the Ninth Circuit's ultimate conclusion—that Robins adequately alleged an injury in fact—was correct". *Id.* at 1550.

As explained below, Plaintiff has sufficiently alleged an injury-in-fact.

### 2. An overwhelming majority of Court's faced with arguments similar to those made by Cabela's have found Article III Standing post-*Spokeo*

Not surprisingly, since the Supreme Court's *Spokeo* decision, the defense bar has been eager to test the theory that a TCPA violation does not cause concrete harm and that a plaintiff like Eldridge thus lacks standing. Fortunately for consumers, such attacks have been rejected.

Plaintiff pleads that he and members of the Classes suffered actual harm and cognizable legal injury, including the aggravation and nuisance and invasion of privacy that results from the receipt of such calls, the loss of value realized for the monies consumers paid to their wireless carriers to receive the calls, and the use and enjoyment of their cellphones. (Compl., DN 1, ¶ 4.)

This is the exact sort of harm courts have found sufficient to constitute standing even after *Spokeo*. *See, e.g., Caudill v. Wells Fargo Home Mortg., Inc.*, No. CV 5: 16-066-DCR, 2016 WL 3820195, at *1-2 (E.D. Ky. July 11, 2016) ("These alleged harms, such as invasion of privacy, have traditionally been regarded as providing a basis for a lawsuit in the United States. . . . Further, when Congress established the TCPA in 1991, it did so to protect consumers from the 'nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate.' . . .  Based on *Spokeo*, the Court is satisfied that [Plaintiff] has alleged an injury-in-fact that is concrete and particularized.) (citations omitted); *Holderread v. Ford Motor Credit Co., LLC*, No. 4:16-CV-00222, 2016 WL 6248707, at *2 (E.D. Tex. Oct. 26, 2016) ("Congress identified the intangible harm of invasion of privacy as legally cognizable. Considering this history and Congress's judgment, the Court finds an invasion of privacy within the context of the TCPA constitutes a concrete harm that meets the injury-in-fact requirements."); *Abramson v. CWS Apartment Homes, LLC*, No. CV 16-426, 2016 WL 6236370, at *2 (W.D. Pa. Oct. 24, 2016) (finding concrete injury for unlawful text messages because the harm is "analogous to the common law tort of invasion of privacy" and that the messages were sent without consent); *Mey v. Got Warranty, Inc.*, No. 5:15-CV-101, 2016 WL 3645195, at *3 (N.D.W. Va. June 30, 2016) ("This Court finds that unwanted phone calls cause concrete harm."); *Booth v. Appstack, Inc.*, No. C13-1533JLR, 2016 WL 3030256, at *5 (W.D. Wash. May 25, 2016) (finding allegations of TCPA violations demonstrate concrete injury); *Rogers v. Capital One Bank (USA), N.A.*, No.

1:15-CV-4016-TWT, 2016 WL 3162592, at *2 (N.D. Ga. June 7, 2016) ("As the Eleventh Circuit has held, a violation of the TCPA is a concrete injury.")

Indeed, in two similar post-*Spokeo* decisions regarding a plaintiff's standing under the TCPA, Judge Kennelly of the Northern District of Illinois explained that the TCPA "establishes substantive, not procedural rights to be free from telemarketing calls consumers have not consented to receive." *Aranda*, 2016 WL 4439935, at *6; *A.D. v. Credit One Bank, N.A.*, No. 14 C 10106, 2016 WL 4417077, at *5-*6 (N.D. Ill. Aug 19, 2016). A plaintiff's standing under the TCPA is supported by the fact that "American and English courts have long heard cases in which plaintiffs alleged that defendants affirmatively directed their conduct at plaintiffs to invade their privacy and disturb their solitude*." Aranda,* 2016 WL 4439935, at *6; *Credit One,* 2016 WL 4417077 at *7. Judge Kennelly also noted that Congress "enacted the TCPA to protect consumers from the annoyance, irritation, and unwanted nuisance of telemarketing phone calls, granting protection to consumers' identifiable concrete interests in preserving their rights to privacy and seclusion." *Aranda,* 2016 WL 4439935, at *6; *Credit One,* 2016 WL 4417077 at *7.

Rather than reference the vast majority of courts that have found standing in TCPA cases, Defendant cites to two cases out of the Southern District of California for the position that TCPA plaintiffs like Eldridge lack standing: *Ewing v. SQM US, Inc.*, No. 3:16-1609-CAB-JLB, 2016 WL 5846494, at *2 (S.D. Cal. Sept. 29, 2016) and *Romero v. Dep't Stores Nat'l Bank*, No. 15-CV-193-CAB-MDD, 2016 WL 4184099, at *6 (S.D. Cal. Aug. 5, 2016), both authored by Judge Bencivengo. With all due respect to Judge Bencivengo, no other courts have adopted the reasoning of *Ewing* or *Romero* and the holdings are rather unpersuasive.

The gravamen of Judge Bencivengo's opinions is that plaintiff's "cannot allege that Defendants' use of an ATDS to dial his number caused him to incur a charge that he would not

17

have incurred had Defendants manually dialed his number, which would not have violated the TCPA. Therefore, Plaintiff did not suffer an injury in fact traceable to Defendants' violation of the TCPA and lacks standing to make a claim for the TCPA violation here." *Ewing*, 2016 WL 5846494, at *2. In essence, *Ewing* and *Romero* stand for the position that the concrete harm inquiry focuses not on the calls themselves, but on the equipment used to make the calls. This is completely contrary to the reason the TCPA was enacted in the first place. Again, Congress "enacted the TCPA to protect consumers from the annoyance, irritation, and unwanted nuisance of telemarketing phone calls, granting protection to consumers' identifiable concrete interests in preserving their rights to privacy and seclusion." *Aranda,* 2016 WL 4439935, at *6; *Credit One,* 2016 WL 4417077 at *7. This is particularly true in Plaintiff's case, where he had no relationship to Cabela's, was harassed as much as 10 times per week, and received calls after asking that they stop.

And even if the focus was on such equipment, *Ewing* and *Romero* misunderstand how calls made using an ATDS are more annoying than manually placed calls. Autodialed calls are incessant. Further, when one answers such a call the first thing the person hears is either a computerized recording or dead air—neither of which allow the person to inform a human being to stop harassing them like a call placed by a person would allow. As such, even if *Ewing* and *Romero* had focused on the correct inquiry, the court's conclusion misunderstands the impact of the technology.

In short, this Court should depart from *Ewing* and *Romero*, join the vast majority of courts who have found standing in TCPA cases post-*Spokeo*, and deny Defendant's Motion on this basis as well.

**D.     Striking Class Allegations On The Pleadings Is Not Warranted Here.**

Turning to Plaintiff's class allegations, Cabela's contends that the Court should strike three of Plaintiff's alleged classes: the "Autodialed No Consent Class," the "Autodialed Stop Class," and the "Pre-recorded Stop Class". (Mot. 10-13.) With respect to the "Autodialed No Consent Class", Defendant seizes upon a typographical error in the drafting of the Complaint that includes language about telemarketing calls in the class definition (Mot. at 13)—this error can be easily cured upon amendment. With respect to the "Autodialed Stop Class" and the "Pre-recorded Stop Class", Defendant argues that the classes aren't ascertainable and makes the novel argument that because Plaintiff never provided consent in the first place, he has no right to opt-out of additional calls. (Mot. at 12.) Neither position is tenable. As explained further below, the Court should deny Defendant's Motion.

"Though procedurally permissible, striking a plaintiff's class allegations prior to discovery and a motion for class certification is a rare remedy." *Modern Holdings, LLC v. Corning Inc.*, No. CIV. 13-405-GFVT, 2015 WL 1481459, at *2 (E.D. Ky. Mar. 31, 2015) (citing *Weathers v. Peters Realty Corp.,* 499 F.2d 1197, 1200 (6th Cir. 1974)); *Chen–Oster v. Goldman, Sachs & Co.,* 877 F.Supp.2d 113, 117 (S.D.N.Y. 2012) ("Generally speaking ... motions of this kind are deemed procedurally premature."); *Chenensky v. New York Life Ins. Co.,* No. 07 CIV. 11504 WHP, 2011 WL 1795305, *1 (S.D.N.Y. Apr.27, 2011) ("A motion to strike class allegations ... is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of ... litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."); *Rios v. State Farm Fire & Cas. Co.,* 469 F.Supp.2d 727, 740 (S.D. Iowa 2007).

"The Sixth Circuit has stated that, generally, 'a district court should defer decision on class certification issues and allow discovery 'if the existing record is inadequate for resolving the relevant issues'." *Modern Holding,* 2015 WL 1481459 at * 3 (citing *Bearden v. Honeywell Int'l, Inc.,* 720 F.Supp.2d 932, 942 (M.D. Tenn. 2010)); *In re Allstate Ins. Co. Underwriting & Rating Practices Litig.,* 917 F.Supp.2d 740, 751 (M.D. Tenn. 2008) (noting that, where "there has not been class discovery ... nor extensive briefing on class issues," it is appropriate to defer decision on contested class issues). "Before a motion to strike [class allegations] is granted, the court must be convinced that any questions of law are clear and not in dispute, and that under no set of circumstances could the claim[s] ... succeed [in class action form]." *Sanders v. Apple Inc.,* 672 F.Supp.2d 978, 990 (N.D. Cal. 2009) (citations omitted).

Thus, striking class allegations is a drastic remedy that should not be utilized here. Striking the class allegations before any discovery has occurred and before Plaintiff can file a motion for class certification on a complete record is premature. Defendant's Motion should be denied for this reason alone.

1.   **Plaintiff's Complaint does not involve telemarketing calls, but rather debt collection calls—the reference to "selling Defendant's products and services" in the definition for "Autodialed No Consent Class" was a drafting error.**

Plaintiff's "Autodialed No Consent Class" is defined as:

All persons in the United States from the last four years to the present who (1) Cabela's (or a third person acting on behalf of Cabela's) called using an ATDS, (2) on the person's cellular telephone number, (3) for the purpose of selling Defendant's products and services, and (4) for whom Defendant claims it obtained prior express consent in the same manner as Defendant claims it supposedly obtained prior express consent to call the Plaintiff.

(Compl. ¶ 39.) Seizing upon the phrase "for the purpose of selling Defendant's products and services", Cabela's argues that this class allegation should be stricken because Plaintiff did not receive telemarketing calls. (Mot. at 13.)

It is correct that Plaintiff does not allege he received telemarketing calls—rather, he alleges that he "received (and continues to receive) approximately 5-10 autodialed and/or prerecorded calls on his cellular telephone number each week, all seeking to collect an outstanding debt owed by the prior owner of Plaintiff's cellular telephone number". (Compl., DN 1, ¶ 33.) The inclusion of the "for the purpose of selling Defendant's products and services" language was a drafting error, which Plaintiff's Counsel regrets—but it is not a basis for striking the class allegations.

Indeed, objections based on the class definition are plainly premature because "litigants and judges regularly modify class definitions." *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005); *see also Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 215 F.R.D. 523, 525 (E.D. Tex. 2003) *aff'd*, 100 F. App'x 296 (5th Cir. 2004) (leave to amend definition proper where "the parties filed additional briefing on the class certification issues and Plaintiffs filed a motion to amend the class definition in order to comply with the summary judgment order and the discussions during the class certification hearing."); *Jones v. Nat'l Council of Young Men's Christian Associations of the U.S.*, 09 C 6437, 2012 WL 5356038 (N.D. Ill. Oct. 30, 2012) (Courts "routinely permit modification of the proposed class definition") (citation omitted); *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 483 (N.D. Cal. 2011) *reconsideration denied*, C 09-01314 JSW, 2012 WL 993531 (N.D. Cal. Mar. 23, 2012); *Mazur v. eBay Inc.,* 257 F.R.D. 563, 568 (N.D. Cal. 2009) (citation omitted).

As such, seizing upon the class definition, as Cabela's tries to do, to hold that a class can never be certified simply turns class action practice on its head: class definitions are routinely modified by courts and litigants as the record develops—the class need not be perfectly defined at the outset. Amendment of the class definitions is routinely allowed. Defendant's Motion should be denied.

**2.    Plaintiff's "stop" classes should not be stricken—class membership doesn't require an individualized inquiry and such a determination is premature in any case, and Plaintiff had the right to request that the calls stop.**

Next, Cabela's argues that Plaintiff's two "stop calling" Classes[1] must be stricken. First, Defendant claims that membership would require an individualized inquiry, and thus the Classes are not ascertainable. This is not a basis for striking class allegations on the pleadings. Second, Cabela's contends that because Plaintiff alleges that he never provided consent in the first place he had no right to request that the calls stop. This novel theory, to which Defendant cites no authority in support (because there is not any), borders on the spurious and should be rejected.

**a.    The classes are ascertainable because the requirements for membership are all objective.**

---

[1] For reference, the two classes at issue are defined as:

**Autodialed Stop Class**: All persons in the United States from the last four years to the present who (1) Cabela's (or a third person acting on behalf of Cabela's) called using an ATDS, (2) on the person's cellular telephone number, (3) after the person informed Cabela's that s/he no longer wished to receive calls from Cabela's, and (4) for whom Defendant claims it obtained prior express consent in the same manner as Defendant claims it supposedly obtained prior express consent to call the Plaintiff.

**Pre-recorded Stop Class**: All persons in the United States from the last four years to the present who (1) Cabela's (or a third person acting on behalf of Cabela's) called, (2) on the person's cellular telephone, (3) used a pre-recorded voice, (4) after the person informed Cabela's that s/he no longer wished to receive calls from Cabela's, and (5) for whom Defendant claims it obtained prior express consent in the same manner as Defendant claims it supposedly obtained prior express consent to call the Plaintiff.

First, Cabela's misunderstands the requirement of ascertainability. "'Before a court may certify a class pursuant to Rule 23,' the class definition must be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'" *APB Associates, Inc. v. Bronco's Saloon, Inc.*, 297 F.R.D. 302, 315 (E.D. Mich. 2013) (quoting *Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 537–38 (6th Cir. 2012) (internal citations omitted)). "[F]or the proposed class to be sufficiently defined, the identity of the class members must be ascertainable by reference to objective criteria." *Snow v. Atofina Chemicals, Inc*., No. 01-72648, 2006 WL 1008002, at *6 (E.D. Mich. Mar. 31, 2006); *Ball v. Union Carbide Corp.,* 212 F.R.D. 380, 391-392 (E.D. Tenn. 2002) (quoting 5 Moore's Federal Practice § 23,21[1] (3rd ed.1997)).

Here, the requirements for class membership are entirely objective. Cabela's either made calls to consumers' cellular telephones after the consumer informed Cabela's that s/he no longer wished to receive the calls, or it did not. *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 250 (N.D. Ill. 2014) ("Again, the key question here is whether 'the same evidence will suffice for each member to make a prima facie showing' as to consent.") (quoting *Messner,* 669 F.3d at 815.)

### b.      It is administratively feasible to identify class members.

Because membership is based on objective criteria, the critical question becomes whether it is administratively feasible to identify class members. Of course it is. First, Cabela's or its subsidiary/agent WFB, will have call records showing the calls placed on Cabela's behalf for the same reasons Cabela's called Plaintiff. Likewise, the records will show the purpose of such calls and how consent was ostensibly obtained.[2] Indeed, the Declaration of Douglas Huss, attached to

---

[2] In general, courts do not look favorably upon the argument that records a defendant treats as accurate for business purposes are not accurate enough to define a class. *See Herrera v. LCS Fin. Servs. Corp.,* 274 F.R.D. 666, 674 (N.D.

Defendant's Motion, makes clear that Defendant can identify the calls it makes because it could do so as to the calls placed to Plaintiff. (*See* Huss Decl. ¶ 4.)

Further, the mere fact that identifying class members requires a modicum of effort does not defeat ascertainability. "[A] class is not rendered unascertainable merely because an analysis of data is necessary to determine class membership. *See Dunnigan v. Metro. Life Ins. Co.,* 214 F.R.D. 125 (S.D.N.Y. 2003) ("[T]he class can be identified through an examination of the individual files of each of the participants. The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement."); *In re TFT–LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 583, 592 (N.D. Cal. 2010). Likewise, the number of "steps" in the process and the time and effort required have no bearing on whether the individuals are or are not objectively ascertainable. *See Dunnigan v. Metro. Life Ins. Co.,* 214 F.R.D. 125, 136 (S.D.N.Y. Jan.2, 2003) ("[T]he class can be identified through an examination of the individual files of each of the participants. The fact that this manual process may be slow and burdensome cannot defeat the ascertainability requirement.").

As such, Defendant cannot show it is administratively unfeasible to determine class membership in the "stop" classes and the class allegations should not be stricken.

### c.   Plaintiff had the right to revoke supposed consent

Finally, Cabela's argues that the "stop" Classes must be stricken by arguing that "[b]y its very definition, revocation can only occur where one has previously provided consent. Here, Plaintiff alleges that he never provided consent to be called on his cell phone . . . so he was incapable of revoking consent. Thus, Plaintiff lacks standing to represent putative classes of

---

Cal. June 1, 2011) ("What was ascertainable to Ocwen in the course of adhering to its own policy is ascertainable for the purposes of identifying members of the class."); *Soutter v. Equifax Info. Servs., LLC,* No. 3:10CV107, 2015 WL 1787236, at *7 (E.D. Va. Apr. 15, 2015)

people who had provided, but later revoked, consent." (Mot. at 12.) This is untenable. Cabela's provides no authority for this position, likely because there isn't any. Plaintiff plainly had the right to revoke any supposed consent and he may represent a class of persons who also revoked any supposed consent.

The TCPA allows consumers to revoke consent and this is "consistent with the basic common law principle that consent is revocable". *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270 (3d Cir. 2013). "Where Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *Id.* (citing *Neder v. United States*, 527 U.S. 1, 21 (1999)). "Congress did not intend to depart from the common law understanding of consent because the statute does not treat the term differently from its common law usage. Under the common law understanding of consent, the basic premise of consent is that it is "given voluntarily." *Id.* at 271 (citing Black's Law Dictionary, 346 (9th ed.2009); Restatement (Second) of Torts § 892 ("Consent is a willingness in fact for conduct to occur.")). "Further, at common law, consent may be withdrawn." *Id.* (citing Restatement (Second) of Torts § 892A, cmt. i (1979) ("[C]onsent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct.")).

The equation does not change in a recycled number case where the called party (here, Plaintiff) never provided consent. As the FCC recently explained,

> In its July 10, 2015, rules and regulations implementing the TCPA, the FCC addressed Rubio's Restaurant, Inc.'s argument that the FCC "should add an affirmative, bad-faith defense that vitiates liability upon a showing that the called party purposefully and unreasonably waited to notify the calling[ ]party of the reassignment in order [to] accrue statutory penalties." *In re Rules Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. at 8011 (internal quotations omitted). The FCC rejected Rubio's Restaurant, Inc.'s request, explaining that "[n]either the TCPA nor our related rules place any affirmative obligation on the

user of a wireless number to inform all potential callers when that number is relinquished or reassigned" and that "uninvolved new users of reassigned numbers are not obligated under the TCPA or our rules to answer every call, **nor are they required to contact each caller to opt out in order to stop further calls."** *Id.*; *see also id.* at 8091.

*Stoops v. Wells Fargo Bank, N.A.*, No. CV 3:15-83, 2016 WL 3566266, at *6 (W.D. Pa. June 24,

2016) (emphasis added). It logically follows that if recycled number consumers are not "required

to contact each called to opt out in order to stop further calls", then they have the right to opt out

in the first place. *See also Nunes v. Twitter, Inc.*, No. 14-CV-02843-VC, 2016 WL 3660526

(N.D. Cal. July 1, 2016) (granting a plaintiff's partial motion for summary judgment in a

recycled number TCPA case where "[plaintiff] replied to some of the text messages in an effort

to get them to stop, but to no avail".)

Yet to hear Cabela's tell it, consumers like Plaintiff who are being bombarded with calls

intended for the prior owner of his or her phone number do not have a right to request that the

calls stop. Rather, according to Defendant, they must simply tolerate being harassed until

Cabela's decides it doesn't want to call them anymore—which may never actually happen. This

turns the TCPA on its head—essentially gutting the entire Act with respect to recycled number

situations—and the argument must be rejected.

## IV.    CONCLUSION

Each of Defendant's arguments for dismissal and for striking the class allegations falls

apart. Plaintiff respectfully requests that the Court deny Defendant's Motion, allow the case to

proceed to discovery, and award such additional relief as the Court deems necessary, reasonable,

and just.

Respectfully submitted,

Dated: November 7, 2016       **FRANKLIN ELDRIDGE**, individually and on
behalf of all others similarly situated,


By: */s/ Elisabeth S. Gray*_____
          One of Plaintiff's Attorneys

Elisabeth Gray
MIDDLETON REUTLINGER
egray@middletonlaw.com
401 South Fourth Street
Suite 2600
Louisville, KY 40202
(502) 584-1135


Steven L. Woodrow*
swoodrow@woodrowpeluso.com
Patrick H. Peluso*
ppeluso@woodrowpeluso.com
3900 E. Mexico Avenue, Suite 300
Denver, Colorado 80210
Tel: 720-213-0675
Fax: 303-927-0809


Stefan Coleman, Esq.*
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, P.A.
201 S. Biscaynve Blvd, 28th Floor
Miami, FL 33131
law@stefancoleman.com
(877) 333-9427

* *Pro hac vice*

*Attorneys for Plaintiff and the putative Class*


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 7, 2016, I served the above and foregoing papers by causing such paper to be filed with the Court using the Court's electronic filing system, which will send copies of such paper to all counsel of record.

Edward H. Stopher
Boehl, Stopher & Graves, LLP-Louisville
400 W. Market Street, Ste 2300
Louisville, Kentucky 40202
*Counsel for Cabela's Incorporated*

Gregory N. Blase
K&L Gates, LLP - Boston
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
*Counsel for Cabela's Incorporated*

Joseph C. Wylie, II
K&L Gates, LLP-Chicago
70 West Madison Street, Suite 3100
Chicago, Illinois  60602-4207
*Counsel for Cabela's Incorporated*

Nicole C. Mueller
K&L Gates, LLP-Chicago
70 West Madison Street, Suite 3100
Chicago, Illinois  60602-4207
*Counsel for Cabela's Incorporated*

*/s/ Elisabeth S. Gray*
*Counsel for Plaintiff Franklin Eldridge,*
*Individually and on behalf of all others*
*similarly situated*

MR 471130v1