UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

FRANKLIN ELDRIDGE, *individually and on*
*behalf of all others similarly situated*,                                    Plaintiffs,

v.                                                                Civil Action No. 3:16-cv-536-DJH

CABELA'S INCORPORATED,                                            Defendant.

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff Franklin Eldridge brings this suit under the Telephone Consumer Protection Act of 1991, alleging that Defendant Cabela's Incorporated, through its wholly owned subsidiary World's Foremost Bank, placed telephone calls using an automatic telephone dialing system and/or artificial or prerecorded voice to cellular telephones of consumers nationwide, without the consumers' prior express consent. (Docket No. 1) Cabela's moved to stay the proceedings pending the outcome of a case currently before the United States Court of Appeals for the D.C. Circuit, *ACA International v. Federal Communication Commission*, No. 15-1211 (D.C. Cir.). (D.N. 19) Cabela's has also moved to dismiss the complaint for failure to state a claim and to strike three of the four classes identified in Eldridge's complaint. (D.N. 20) For the reasons set forth below, the motion to stay and motion to dismiss will be denied. The motion to strike will be granted in part and denied in part, and Eldridge will be given leave to file an amended complaint.

### I.      Background

The following facts are set out in the complaint and accepted as true for purposes of the present motions. *See Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)).

Cabela's is a specialty retailer and a direct marketer of hunting, fishing, camping, and related outdoor merchandise. (D.N. 1, PageID # 4) According to Eldridge's complaint, World's Foremost Bank (WFB) is a wholly owned subsidiary of Cabela's tasked with issuing and managing the Cabela's CLUB Visa credit card, a rewards-based card program. (*Id.*) During 2015, Cabela's maintained approximately 1.9 million active credit-card accounts. (*Id.*) When consumers sign up for a Cabela's CLUB Visa credit card issued by WFB, they are presented with disclosures that make it clear that "WFB, its affiliates and agents . . . ha[ve] express consent to contact you at any telephone number you provide to WFB." (*Id.*)

In or around February 2016, Eldridge obtained a new cellular telephone number from Cricket Wireless. (*Id.*, PageID # 10) Shortly thereafter, he began receiving autodialed and prerecorded calls to his cellular telephone number from Cabela's, all seeking to collect an outstanding debt allegedly owed by the prior owner of Eldridge's cellular telephone number. (D.N. 1, PageID # 10) Eldridge is not a Cabela's customer and never provided his consent for Cabela's to contact him. (*Id.*, PageID # 11) Furthermore, starting in February 2016, Eldridge repeatedly asked Cabela's to stop calling him, but Cabela's continued to place autodialed and prerecorded calls to Eldridge. (*Id.*, PageID # 12)

Eldridge brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of himself and members of four putative classes: (1) an "Autodialed No Consent Class," consisting of persons whom Cabela's called using an automatic telephone dialing system (ATDS) without their prior consent; (2) a "Pre-recorded No Consent Class," consisting of persons whom Cabela's called using a prerecorded voice without their prior consent; (3) an "Autodialed Stop Class," consisting of persons whom Cabela's called using an ATDS after such persons had informed Cabela's that they no longer wished to receive calls from

Cabela's; and (4) a "Pre-recorded Stop Class," consisting of persons whom Cabela's called using a prerecorded voice after such persons had informed Cabela's that they no longer wished to receive calls from Cabela's. (*Id.*, PageID # 12–13) Eldridge seeks an injunction requiring Cabela's to cease placing autodialed and prerecorded calls to cellular telephones without the express consent of the recipients and preventing similar conduct by Cabela's in the future, as well as an award of statutory damages to the members of the putative classes. (*Id.*, PageID # 3)

Eldridge's claims arise under the Telephone Consumer Protection Act (the TCPA), 47 U.S.C. § 227. The TCPA allows a recipient of an unsolicited call to bring suit and recover damages (including statutory damages) against the maker of that call under certain circumstances. Specifically, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). Regarding the "prior express consent" exception, the Federal Communications Commission (FCC) has ruled that once given, consent may be revoked "at any time and through any reasonable means." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, 30 FCC Rcd. 7961 at ¶ 47 (rel. July 10, 2015).

Eldridge alleges that Cabela's has violated the TCPA because members of the putative classes did not expressly consent to receiving calls from Cabela's. (D.N. 1, PageID # 5) Indeed, many class members have no history with Cabela's and have allegedly received such calls from the company only because of a practice known as "recycling." "Recycling" is the process by which cellular telephone carriers reassign relinquished cellular telephone numbers to other

subscribers. (*Id.*, PageID # 6) Eldridge alleges that in such instances, Cabela's simply treats the new cellular number owner as if he or she were the previous owner. (*Id.*)

Cabela's moved to stay these proceedings pending the outcome of a case currently before the United States Court of Appeals for the D.C. Circuit, *ACA International v. Federal Communication Commission,* No. 15-1211 (D.C. Cir.). (D.N. 19) Cabela's has also moved to dismiss Eldridge's complaint and to strike three of the four putative classes described in the complaint: the two so-called "Stop" classes and the first of the two "No Consent" classes. (D.N. 20-1, PageID # 132).

## II. Motion to Stay

In support of its motion to stay, Cabela's argues that the resolution of *ACA Int'l* "may moot Plaintiff's claims in their entirety, or have a significant effect on the scope and extent of discovery." (D.N. 19-1, PageID # 87) The Court disagrees. For the reasons set forth below, Cabela's motion to stay will be denied.

On July 10, 2015, the FCC issued a ruling clarifying certain terms and provisions of the TCPA. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling and Order, 30 FCC Rcd 7961 (rel. Jul. 10, 2015) ("2015 Order"). The FCC held that the term "called party" means the current "subscriber and customary user" of a wireless telephone number rather than the "intended recipient." *Id.* ¶¶ 71–84. The FCC also concluded that where a number has been recycled to a new subscriber, liability under the TCPA may accrue starting with the second call to the recycled number regardless of whether the caller knows that the cellular number has been assigned to a new subscriber. *Id.* ¶ 82. Additionally, the FCC took the position that *any* equipment that is capable of being modified to generate random or sequential telephone numbers constitutes an ATDS. *Id.* ¶¶ 15–20. Following the

ruling, petitions were filed in the United States Court of Appeals for the D.C. Circuit seeking review of the Order. The petitioners challenge the three major findings of the Order. *See* Joint Petitioner Final Brief at 4, *ACA Int'l*, No. 15-1211 (D.C. Cir. Feb. 24, 2016). Briefing in *ACA Int'l* was completed in February 2016, and oral argument was held on October 19, 2016.

## A. Legal Standard

A trial court has broad discretion to stay all proceedings pending the resolution of independent proceedings elsewhere. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). Such power is incidental to the power inherent in every court to control the disposition of the cases on its docket. *Clinton v. Jones*, 520 U.S. 681, 706–07 (1997) (citing *Landis*, 299 U.S. at 254). "While there is no precise test for determining whether to issue a stay, the Court considers the balance of the hardships, the potential harm to the public, and judicial economy and efficiency." *Caudill v. Wells Fargo Home Mortg., Inc.*, No. CV 5:16-066-DCR, 2016 WL 3820195, at *2 (E.D. Ky. July 11, 2016) (citing *IBEW, Local 2020 v. AT&T Network Sys.*, No. 88-3895, 1989 WL 78212, at *8 (6th Cir. July 17, 1989)). "The most important consideration is the balance of hardships; the moving party has the burden of proving that it will suffer irreparable injury if the case moves forward, and that the non-moving party will not be injured by a stay." *IBEW, Local 2020,* 1989 WL 78212, at *8 (citing *Landis*, 299 U.S. at 255); *see also F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 628 (6th Cir. 2014) ("The most important factor is the balance of the hardships.") (citing *IBEW, Local 2020,* 1989 WL 78212, at *8). Additionally, a stay should not be for an "indefinite duration in the absence of pressing need." *Landis*, 299 U.S. at 255. "A court must tread carefully in granting a stay of proceedings, since a party has a right to a determination of its rights and liability without undue delay." *Ohio Envtl. Council v. U.S. Dist. Court., S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977).

**B.      Balance of Hardships**

Cabela's argues that a stay is appropriate in this case because (1) the issues to be resolved in *ACA Int'l* by the D.C. Circuit may guide the Court's disposition of this case, simplify the issues, and promote judicial economy; (2) a decision in *ACA Int'l* is expected shortly, so the stay would likely not cause excessive delay; (3) Eldridge has not demonstrated how he would be prejudiced by a stay of the proceedings; and (4) proceeding with discovery will cause undue harm and waste resources.  (D.N. 19-1, PageID # 88; D.N. 24, PageID # 220)  Concerning the balance of hardships specifically, Cabela's claims that "Plaintiff will not be prejudiced by the stay pending the outcome of the ACA Case where, as here, the stay is only expected to last a matter of months at most."  (D.N. 19-1, PageID # 94)

Yet as Eldridge notes in his response, *ACA Int'l* has been fully briefed since February 2016, and oral argument was held on October 19, 2016.  (D.N. 21, PageID # 153)  Contrary to Cabela's assertion that "a decision is expected by the end of 2016," the time that the D.C. Circuit will issue its opinion in *ACA Int'l* is entirely unclear; as of the date of this Opinion, the case remains pending.  *See Lathrop v. Uber Techs., Inc.*, 2016 WL 97511, at *4 (N.D. Cal. Jan. 8, 2016) (denying motion to stay pending *ACA Int'l* in part because "neither the parties nor the Court can forecast when the D.C. Circuit will ultimately issue a decision").  Furthermore, the D.C. Circuit is unlikely to be the final step in the litigation.  "Whichever party is unsuccessful in that court is almost certain to appeal to the Supreme Court."  *Id.*  In any event, Cabela's has misstated the applicable burden.  It is not Eldridge who must show prejudice, but rather Cabela's who must prove that Eldridge will not be injured by a stay.  *IBEW, Local 2020,* 1989 WL 78212, at *8.  Because Cabela's has failed to refute that further delay will hinder Eldridge's ability to

reach class members or increase the risk that evidence will dissipate (D.N. 21, PageID # 155), the Court finds that further delay will likely prejudice Eldridge.

Next, Cabela's argues that without a stay, it "will be forced to go through with discovery that may become moot if some (or all) claims in this matter are resolved following the ACA Case decision." (D.N. 24, PageID # 224) In Cabela's assessment, granting a stay will avoid "the expense and disruption of discovery and motion practice in a case that may not present any valid claims." (D.N. 19-1, PageID # 95) The Court finds, however, that harm in the form of time and expense incurred to litigate a case is not sufficient to warrant the requested stay, particularly given the speculation concerning the length of the stay and the uncertainty over whether the *ACA Int'l* decision would be dispositive of this case (discussed infra).

## C.    Judicial Economy and Efficiency

Additionally, Cabela's argues that a stay is necessary to tailor the claims and defenses that remain after a ruling in *ACA Int'l*. (D.N. 24, PageID # 220) Cabela's cites eighteen federal TCPA cases in twelve jurisdictions that have been stayed based in whole or in part on the pending decision in *ACA Int'l*. (D.N. 19-1, PageID # 92–93) Many of the courts that did so based their rulings on ideas of judicial economy and efficiency. *See*, *e.g.*, *Errington v. Time Warner Cable, Inc.*, 2:15-CV-02196 RSWL (DTB), 2016 WL 2930696, at *4 (C.D. Cal. May 18, 2016) ("[G]ranting a stay may simplify the issues in this case and conserve judicial resources."). Cabela's argues that *ACA Int'l* could be dispositive of two issues central to this case. First, Cabela's contends that if the D.C. Circuit holds that the statutory term "called party" means the expected recipient of the call, or that the safe-harbor provision extends beyond the first call, it will have a complete defense to Eldridge's claims. (D.N. 19-1, PageID # 95) Second, Cabela's argues that if the D.C. Circuit holds that the definition of ATDS should be limited to equipment

with only the present capacity to generate random or sequential telephone numbers, it will have a partial defense to Eldridge's claims. (*Id.*)

Yet most vexing for Cabela's position is its own use of probabilistic language: "[*ACA Int'l*] *could* be dispositive of this case . . . [*ACA Int'l*] *could* simplify the issues for discovery . . . without a stay, Cabela's will be forced to go through with discovery that *may* become moot [in light of *ACA Int'l*]." (D.N. 24, PageID # 224 (emphasis added)) Furthermore, as Eldridge notes, the calls at issue allegedly featured a prerecorded voice as well as an ATDS. (D.N. 21, PageID #156) As such, two of the proposed classes do not depend in any way on the use of an ATDS and thus will not be affected by this aspect of *ACA Int'l*. (*Id.*) Cabela's sole response to Eldridge's argument is that "[i]f Plaintiff intends on pursuing [these] claim[s], [they] can be resolved very quickly on a motion for summary judgment with limited or no discovery." (D.N. 24, PageID # 221) Notwithstanding this confident assertion, the Court finds that Cabela's has not adequately addressed the concern that regardless of the D.C. Circuit's ruling, key issues will remain.

Moreover, Cabela's fails to adequately address the fact that even following a published opinion in *ACA Int'l*, the Court may draw from various other appellate-court interpretations of the term "called party," at least until the FCC rules on the matter again. (D.N. 21, PageID # 156 (citing *Leyse v. Bank of Am. Nat' Ass'n*, 804 F.3d 316, 325 n.13 (3d Cir. 2015) (defining a "called party"); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1251 (11th Cir. 2014) (same); *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 640–41 (7th Cir. 2012) (same); *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) (same)))

Ultimately, Cabela's cannot support its motion to stay on judicial-efficiency grounds alone, especially given that prejudice to the non-movant is the most important consideration.

*IBEW, Local 2020*, 1989 WL 78212, at *8; *see also Mancini v. JPMorgan Chase Bank, N.A.*, No. 1:15-cv-61524-UU, 2016 WL 1273185, at * 1 (S.D. Fla. Mar. 28, 2016) ("Any stay would be indefinite and solely in the interests of judicial economy, which the Supreme Court has found to be insufficient justification for a stay pending a similar proceeding." (citing *Landis*, 299 U.S. at 257)). Finding that the balance of hardships weighs against granting a stay, the Court will deny Cabela's motion to stay these proceedings.

### III.     Motion to Dismiss

Cabela's raises two arguments in support of its motion to dismiss. First, Cabela's argues that Eldridge has failed to plead facts establishing direct or vicarious liability on the part of Cabela's. (D.N. 20-1, PageID # 135; D.N. 23, PageID # 206) Specifically, Cabela's asserts that it cannot be held liable for the acts of its subsidiary WFB. (D.N. 20-1, PageID # 135) Cabela's also argues that Eldridge lacks standing to sue because "he has not alleged any concrete injury that is fairly traceable to any party's use of an ATDS or pre-recorded voice message." (D.N. 20-1, PageID # 137) Both arguments fail.

### A.     Legal Standard

In order to avoid dismissal for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint need not contain "detailed factual allegations," but it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). For purposes of a motion to dismiss, "a district court must (1) view

the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett*, 561 F.3d at 488 (citing *Gunasekera,* 551 F.3d at 466 (citations omitted)).

## B.    Agency

Cabela's first argues that Eldridge has failed to plead facts establishing that it is directly or vicariously liable for WFB's actions.  (D.N. 20-1, PageID # 135; D.N. 23, PageID # 206) While the parties agree that Cabela's did not directly make the calls in question, there remains the key issue of whether WFB acted as Cabela's agent.  If so, Cabela's can be held liable under the TCPA. *See In the Matter of the Joint Petition Filed by Dish Network, LLC, the United States of America, and the States of California, Illinois, North Carolina, and Ohio for Declaratory Ruling Concerning the Telephone Consumer Protection Act (TCPA) Rules,* 28 FCC Rcd. 6574, 6584 (rel. May 9, 2013) (recognizing that under 47 U.S.C. § 227(b), defendants "may be held vicariously liable . . . for TCPA violations . . . under a broad range of [federal common-law] agency principles, including not only formal agency, but also principles of apparent authority and ratification"); *see also Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 371 (6th Cir. 2015) (recognizing agency liability under § 227(b)).

Cabela's argues, however, that Eldridge's complaint fails to allege any facts that would establish an agency relationship between Cabela's and WFB.  (D.N. 20-1, PageID # 136)  But this argument appears inaccurate.  Cabela's correctly notes that Eldridge's complaint does not explicitly plead that WFB was Cabela's agent.  (D.N. 23, PageID # 207)  Explicit pleading, however, is not the standard.  Rather, to survive a motion to dismiss, Eldridge need only plead "factual content that allows the court to draw the reasonable inference that [Cabela's] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Eldridge's complaint pleads sufficient facts for

the Court to infer the existence of an actual, implied agency relationship between Cabela's and WFB. At the very least, the complaint raises a plausible claim that Cabela's ratified WFB's conduct.[1]

"An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006). Specifically, actual, implied agency exists when an agent's acts are "necessary and incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives when the agent determines how to act." *Id*. § 2.02(1). Furthermore:

An agent's understanding of the principal's objectives is reasonable if it accords with the principal's manifestations and the inferences that a reasonable person in the agent's position would draw from the circumstances creating the agency.

*Id.* § 2.02(3)

Eldridge's complaint alleges facts that, taken as true, indicate WFB was an actual, implied agent of Cabela's. Specifically, the complaint alleges that WFB is a wholly owned subsidiary of Cabela's "established" to issue and manage the Cabela's CLUB Visa credit card. (D.N. 1, PageID # 4; D.N. 22, Page ID # 175) A reasonable person in WFB's position would infer that debt-collection efforts such as the calls at issue in this suit are "necessary and incidental" to such card management. Indeed, the central aspect of managing any credit system is ensuring payment from the debtor. Thus, Cabela's creation of WFB for the sole purpose of issuing and managing credit is itself a key manifestation shedding light on Cabela's objectives for WFB. Based on this "manifestation" it is entirely plausible that WFB reasonably believed

---

[1] In light of these findings, the Court need not address Eldridge's contention that WFB had apparent authority. (D.N. 22, PageID # 176–77)

that Cabela's wished it to place the calls at issue, thus satisfying the test for actual, implied agency. *See* Restatement (Third) of Agency § 2.01(1), (3).

Cabela's argument that Eldridge must demonstrate that Cabela's "controlled the manner and means by which" the call to his phone was made is not well taken. (D.N. 23, PageID # 208 (quoting *Weary v. Cochran*, 377 F.3d 522, 524–525 (6th Cir. 2004)) *Weary* concerned the common-law agency test for determining whether a hired party is an employee or an independent contractor. *Id.* at 524 (citations omitted). Furthermore, this argument ignores the recognition of actual, implied agency in TCPA cases by numerous courts. *See*, *e.g.*, *Cunningham v. Rapid Response Monitoring Servs., Inc.*, No. 3:15–cv–00846, 2017 WL 1489052, at *7 (M.D. Tenn. Apr. 26, 2017) (denying defendant's motion to dismiss by noting that a TCPA plaintiff may plead actual authority, which "may be express or implied"); *Henderson v. United Student Aid Funds, Inc.*, No.: 13cv1845 JLS (BLM), 2017 WL 766548, at *8 (S.D. Cal. Feb. 28, 2017) (same); *In re: Monitronics International, Inc., Telephone Consumer Protection Act Litigation*, 223 F. Supp. 3d 514, 520 (N.D. W. Va. 2016) (same); *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 938–39 (7th Cir. 2016) (recognizing implied agency liability under the TCPA). Again, "[the Court] must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett*, 561 F.3d at 488. When Eldridge's complaint is viewed in the light most favorable to him, it is entirely plausible that WFB acted with actual, implied authority in placing the debt-collection calls.

Even if this were not the case, the complaint raises a plausible inference that Cabela's ratified the conduct in question. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01(1). A principal can ratify an act by "manifesting assent that the act

shall affect the person's legal relations," or by "conduct that justifies a reasonable assumption that the person so consents." *Id.* § 4.01(2). Here, Eldridge raises a plausible theory that Cabela's affirmed WFB's calling practices. WFB allegedly made the calls at issue for the purpose of collecting balances owed on Cabela's credit cards. (D.N. 1, PageID # 4) The complaint further alleges that Cabela's knew of WFB's calling practices, as evidenced by its SEC filings. On its SEC Forms, Cabela's discusses its CLUB Visa credit card collection and recovery processes with a first-person pronoun: "We employ a 'cradle to grave' collection approach . . . . We employ an autodialer." (*Id.*, PageID # 5 (emphasis removed)) Moreover, Eldridge alleges that despite receiving "numerous complaints" alerting it to WFB's autodialing methods, Cabela's did nothing to halt the calls. (*Id.*, Page ID # 5, 8) Again, given that the Court must take all well-pleaded factual allegations as true, *Tackett*, 561 F.3d at 488, Eldridge has pleaded sufficient facts to raise a reasonable inference that Cabela's ratified the conduct at issue.

Ultimately, the FCC has rejected the idea that consumers need to show, in their initial pleadings, that a seller is vicariously liable for offending calls. *See In re Dish Network*, 28 FCC Rcd. 6574 at ¶ 28 ("[W]e stress that nothing in this order requires a consumer to provide proof—at the time it files its complaint—that the seller should be held vicariously liable for the offending call."). The *Twombly-Iqbal* standard governs instead. Eldridge has satisfied this standard by pleading facts that plausibly suggest an agency relationship between Cabela's and WFB.

## C. Standing

Cabela's additionally argues that Eldridge lacks standing to sue because "he has not alleged any concrete injury that is fairly traceable to *any* party's use of an ATDS or pre-recorded voice message." (D.N. 20-1, PageID # 137) Cabela's argument relies exclusively on the

Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). In *Spokeo*, the Court held that a plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 1549. Seizing on this language, Cabela's argues that "[a]t most, Plaintiff has alleged only a mere technical violation of the TCPA, without alleging any actual concrete harm, much less any harm traceable to the alleged use of an ATDS or pre-recorded voice to call Plaintiff's cell phone." (D.N. 20-1, PageID # 137–38) The Court disagrees.

The Ninth Circuit's recent opinion concerning a similar TCPA claim is instructive. In *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017), the defendants argued that the plaintiff had not established the concrete injury in fact necessary to pursue his TCPA claim in light of *Spokeo*. *Id.* at 1042. The Ninth Circuit disagreed, explaining: "[B]oth history and the judgment of Congress play important roles in supporting our conclusion that a violation of the TCPA is a concrete, *de facto* injury." *Id.* at 1043. Specifically, the Ninth Circuit reasoned: "The TCPA establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent. Congress identified unsolicited contact as a concrete harm, and gave consumers a means to redress the harm." *Id.*; s*ee also Susinno v. Work Out World, Inc.*, 862 F.3d 346, 352 (3d Cir. 2017) (holding that even in light of *Spokeo*, "the TCPA provides [the plaintiff] with a cause of action, and that her injury satisfies the concreteness requirement for constitutional standing"); *Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 858 F.3d 1362, 1366 (11th Cir. 2017) (holding that defendant's alleged violation of the TCPA was sufficient to satisfy injury-in-fact element of Article III standing).

Additionally, as Eldridge notes, *Spokeo* was not a "seismic shift" in the law of standing. (D.N. 22, PageID # 182 (citing *Aranda v. Caribbean Cruise Line, Inc.*, 202 F. Supp. 3d 850, 855

(N.D. Ill. Aug 23, 2016) ("*Spokeo* was not the first case to set forth that an injury must be both concrete and particularized to suffice as an injury-in-fact for the purposes of constitutional standing. . . . [C]oncreteness and particularity have been the twin pillars of a justiciable injury-in-fact for at least forty years." (citations omitted)))) The harms alleged here are the exact types of harm courts within this circuit have found sufficient even after *Spokeo*. In his complaint, Eldridge alleges that Cabela's has caused him and the members of the putative classes actual harm, in the form of "aggravation and nuisance and *invasions of privacy* that result from the receipt of such calls, in addition to a loss of value realized for the monies consumers paid to their wireless carriers for the receipt of such calls." (D.N. 1, PageID # 2 (emphasis added)) *Cf. Caudill,* 2016 WL 3820195, at *2 ("These alleged harms, such as invasion of privacy, have traditionally been regarded as providing a basis for a lawsuit in the United States. . . . Based on *Spokeo*, the Court is satisfied that [Plaintiff] has alleged an injury-in-fact that is concrete and particularized.").

Nor is Cabela's final standing argument persuasive. Cabela's argues that even if Eldridge experienced the alleged injuries, his claim fails because he cannot show that the use of an ATDS or prerecorded voice caused him to incur a charge that he would not have incurred had Cabela's manually dialed his number, which would not have violated the TCPA. (D.N. 20-1, PageID # 138; D.N. 23, PageID # 213) This argument ignores the reason Congress enacted the TCPA in the first place. *See*, *e.g.*, *Caudill*, 2016 WL 3820195, at *2 ("[W]hen Congress established the TCPA in 1991, it did so to protect consumers from the 'nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate.'" (citations omitted)).

In sum, both arguments raised by Cabela's in support of its motion to dismiss fail. The Court will therefore deny the motion to dismiss.

## IV.    Motion to Strike

Cabela's also moves to strike three of the four putative classes: the two so-called "Stop" classes and the "Autodialed No Consent Class." (D.N. 20-1, PageID # 139–42) For the reasons set forth below, the Court will strike the two "Stop" classes from Eldridge's complaint. However, because the problem with the "Autodialed No Consent Class" derives from an apparent drafting error, the Court will grant Eldridge a chance to amend this class's definition.

### A.    Legal Standard

A defendant may move to strike class allegations even before a plaintiff has filed a motion for class certification. 1 McLaughlin on Class Actions § 3:4 (10th ed. 2013); *see also Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011) (noting that a motion to strike may come before a motion to certify and that "either plaintiff or defendant may move for a determination of whether the action may be certified under Rule 23(c)(1)" (alteration removed)). Some courts within this circuit have held that "the standard of review [on a motion to strike class allegations] is the same as that applied in deciding a motion to dismiss under Rule 12(b)(6)." *Schilling v. Kenton Cty., Ky.*, No. 10–143–DLB, 2011 WL 293759, at *4 (E.D. Ky. Jan. 27, 2011) (citing *Jimenez v. Allstate Indem. Co.*, No. 07–cv–14494, 2010 WL 3623176, at *3 (E.D. Mich. Sept. 15, 2010)). "The moving party has the burden of demonstrating from the face of the [plaintiff's] complaint that it will be impossible to certify the class as alleged, regardless of the facts plaintiff[] may be able to prove." *Id.* (citing *Jimenez*, 2010 WL 3623176, at *3).

Thus, even when the class-action issue is before a court in the context of a motion to strike, the central question is whether the Rule 23 prerequisites are met. *Id.* (citing *Thomas v. Moore USA, Inc.,* 194 F.R.D. 595, 597 (S.D. Ohio 1999)); *see also Bearden v. Honeywell Int'l,*

*Inc.*, 720 F. Supp. 2d 932, 942 (M.D. Tenn. 2010) (citing *Smith v. Bayer Corp.* (*In re Baycol Prods. Litig.*), 593 F.3d 716, 721 n.2 (8th Cir. 2010)).  Accordingly, if the plaintiff will be unable to establish even one of the Rule 23 prerequisites, the class allegations must be stricken. *Schilling*, 2011 WL 293759, at *4; *see also Thornton v. State Farm Mut. Auto Ins. Co*., No. 1:06–cv–00018, 2006 U.S. Dist. LEXIS 83972, at *15–16 (N.D. Ohio Nov. 17, 2006) (striking class allegations because claims would require individualized inquiry).

With this said, Rule 12(f) is the procedural vehicle for striking class allegations.  *Nevada-Martinez v. Ahmad*, No. 5:15-cv-239-JMH, 2016 WL 7888046, at *3 (E.D. Ky. June 17, 2016) (discussing in the context of a motion to strike class allegations that "Rule 12(f) also allows a court, on its own or by motion of either party, to strike from a pleading 'any redundant, immaterial, impertinent or scandalous matter' to avoid wasting 'time and money litigating spurious issues'" (quoting Fed. R. Civ. P. 12(f))).  Accordingly, the Court may also strike any class allegations that are redundant.  Fed. R. Civ. P. 12(f); s*ee also Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1179 (S.D. Cal. 2012) ("[S]o long as class action allegations address each of the elements of Rule 23, relate to the subject matter of the litigation, *and* are not redundant, immaterial, or impertinent, the court should find that the allegations are sufficient to survive a motion to strike."  (emphasis added) (internal quotations omitted)).

## B.     "Stop" Classes

Eldridge's "Autodialed Stop Class" is defined as:

All persons in the United States from the last four years to the present who (1) Cabela's (or a third person acting on behalf of Cabela's) called using an ATDS, (2) on the person's cellular telephone number, (3) after the person informed Cabela's that s/he no longer wished to receive calls from Cabela's, and (4) for whom Defendant claims it obtained prior express consent in the same manner as Defendant claims it supposedly obtained prior express consent to call the Plaintiff.

(D.N. 1, PageID # 12–13)

Eldridge's "Pre-recorded Stop Class" is nearly identical, except that the phrase "using an ATDS" is replaced with "using a pre-recorded voice." (*Id.*, PageID # 13)

Cabela's raises two issues with respect to the "Stop" classes. First, the FCC has ruled that for purposes of liability under § 227(b), "prior express consent" may be revoked "at any time and through any reasonable means." *2015 Order*, 30 FCC Rcd. 7961 at ¶ 47. Accordingly, Cabela's argues that determining membership in Eldridge's "Stop" classes would require individualized, fact-intensive inquiries as to whether consent was revoked, defeating the predominance and commonality requirements under Rule 23. (D.N. 20-1, PageID #139-140) *See Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 431 (6th Cir. 2009) (explaining that certification is not appropriate where "the only way to distinguish between" members and non-members of the purported class "is to engage in individualized fact-finding"). Additionally, Cabela's argues that Eldridge is not a member of the putative "Stop" classes, and thus fails Rule 23's typicality requirement, because Eldridge himself alleges that he never provided consent to be called. (D.N. 20-1, PageID # 141)

The difficulty in resolving this issue stems from the fact that Eldridge and Cabela's attach two very different definitions to Eldridge's "Stop" classes. Moreover, although Eldridge is the "master of his complaint," Cabela's interpretation is entirely plausible. Under either interpretation, Eldridge's "Stop" classes should be stricken.

Cabela's maintains that what Eldridge passes as "Stop" classes are really "Revocation" classes. In other words, the "Stop" classes are comprised of persons who had a prior relationship with Cabela's but subsequently revoked their consent to be called by Cabela's. (D.N. 20-1, PageID # 139) This interpretation makes sense on a plain reading of Eldridge's complaint. In its "Autodialed Stop Class" section, the complaint describes the class's members as persons who

"had informed [Cabela's] they *no longer* wished to receive such calls from [Cabela's]." (D.N. 1, PageID # 17 (emphasis added))  This language also appears in the complaint's description of the "Pre-recorded Stop Class."  In essence, Cabela's argues that informing someone you "no longer wish" to receive their calls implies that at one time you *consented* to receive their calls.  Indeed, the complaint refers on other occasions to class members who had previously consented to receiving calls from Cabela's.  (*See id.*, PageID # 5 ("Cabela's calls to consumer's cellular telephones violate the TCPA because (1) the telephone owner did not consent to receiving the calls . . . and/*or* (2) the current cellular telephone owner has expressly requested not to receive such calls." (emphasis added)); *id.*, Page ID # 9 ("But, even with prior consent, Cabela's is required to honor each stop-request as a termination of any *prior* consent. Accordingly, any autodialed or prerecorded calls made to a cellular subscriber after receiving an express stop request is done without express consent." (emphasis added)))

Eldridge, in a rather convoluted manner, argues against this interpretation in his response. He discusses at length the ascertainability of the "Stop" classes, the administrative feasibility of identifying their members, and whether one may revoke *supposed* consent under the TCPA. (D.N. 22, 189–193)  Notably, Cabela's raises none of these issues in its motion to strike.  (D.N. 20-1, PageID # 139–42)  Still, one might glean from Eldridge's response one suitable argument, namely that the members of Eldridge's "Stop" classes are simply persons who explicitly told Cabela's to "stop" calling their cellular telephone numbers and for whom Cabela's never had consent to call.

Under Cabela's interpretation, it is clear that caselaw favors striking the "Stop" classes. In recent TCPA cellular-telephone cases, district courts have struck "Revocation" classes from complaints or have denied class certification entirely.  *See*, *e.g., Cholly v. Uptain Grp., Inc.*, No.

15 C 5030, 2017 WL 449176, at *4 (N.D. Ill. Feb. 1, 2017) ("[I]ndividual inquires necessary to determine class membership will 'inevitably predominate' over any common questions of fact. Consequently, the proposed revocation class fails to satisfy Rule 23(b)(3) and the class allegations are stricken." (citation omitted)); *Saulsberry v. Meridian Fin. Servs., Inc.*, No. CV 14-6256 JGB, 2016 WL 3456939, at *11 (C.D. Cal. April 14, 2016) ("Each of these forms of revocation of consent may give rise to its own evidentiary issues, rendering it difficult for the Court to resolve any questions on a class-wide basis. . . . The commonality requirement is therefore not met with regards to the TCPA Revocation Class."); *Wolfkiel v. Intersections Ins. Servs., Inc.*, 303 F.R.D. 287, 293 (N.D. Ill. 2014) ("The Revocation Class fails to satisfy the predominance requirement. In order to determine whether each potential class member did in fact revoke his or her prior consent at the pertinent time, the Court would have to conduct class-member-specific inquiries for each individual.").

Moreover, if these classes are "Revocation" classes, Eldridge is not a typical member. Eldridge alleges that he never provided consent to be called on his cell phone. (D.N. 1, PageID # 11) But Eldridge could not revoke consent he never gave in the first place. (D.N. 23, PageID # 215) Thus, the "Stop" classes fail to satisfy the Rule 23 prerequisites, barring certification under both Rule 23(b)(2) and (b)(3).[2]

---

[2] Rule 23(b)(2) allows for certification of classes that seek injunctive and declaratory relief. The rule does not extend to cases in which the appropriate final relief relates to money damages, at least where such damages are not "incidental." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 363–67 (2011). Eldridge could seek certification under Rule 23(b)(2) to the extent he requests injunctive relief. His claims for money damages, however, must be certified under Rule 23(b)(3). Furthermore, classes certified under either subsection must meet the Rule 23(a) prerequisites. Classes certified under Rule 23(b)(3) must also satisfy the predominance and superiority requirements. Fed. R. Civ. P. 23(b)(3). Thus, even if Eldridge were to argue that his "Stop" classes fail the predominance requirement only and that his claims for injunctive relief may proceed under Rule 23(b)(2), these claims would fail because Eldridge is not a "typical" member of these classes. Fed. R. Civ. P. 23(a)(3).

Additionally, even under Eldridge's interpretation, the "Stop" classes cannot survive the motion to strike. Section 227(b) does not distinguish between consumers who have requested to stop receiving calls and consumers who never consented in the first place. Rather, the key distinction is between those who have consented and those who have not—the latter group consisting of both consumers who never consented and consumers who revoked their previous consent. 47 U.S.C. § 227(b) Accordingly, Cabela's would be equally liable to those who have passively not consented to receive calls and to those who have taken affirmative steps to inform Cabela's they do not wish to receive calls. *See 2015 Order*, 30 FCC Rcd. ¶ 95 ("[U]ninvolved new users of reassigned numbers are not obligated under the TCPA or our rules to answer every call, nor are they required to contact each caller to opt out in order to stop further calls.").

It is clear, then, that if Eldridge's "Stop" classes consist solely of those persons who have taken such affirmative steps, they are superfluous in light of Eldridge's "No Consent" classes.[3] In other words, Cabela's had "no consent" from those persons who told it to stop calling them. If the facts are as Eldridge has alleged, these same individuals are already included in the "No Consent" classes.[4] The "Stop" classes are therefore redundant and should be stricken. *See* Fed. R. Civ. P. 12(f). The Court will therefore strike from the complaint Eldridge's "Stop" classes.

## C.    Autodialed No Consent Class

Eldridge's "Autodialed No Consent Class" is defined as:

---

[3] If Eldridge is to maintain his interpretation, the classes must consist solely of such persons. Eldridge cannot attempt to also include persons for whom Cabela's had previous consent to call. Such classes could not be certified under Rule 23 for the reasons explained above.

[4] Certain language from the complaint also suggests overlap. Both "Stop" classes consist of all persons "for whom Defendant claims it obtained prior express consent in the *same* manner as Defendant claims it supposedly obtained prior express consent to call the Plaintiff." (D.N. 1, PageID # 12–13 (emphasis added)) Thus, the complaint implies that, like Eldridge, members of the "Stop" classes never gave their consent to be called by Cabela's. By not giving consent, these members are included in Eldridge's "No Consent" classes.

All persons in the United States from the last four years to the present who (1) Cabela's (or a third person acting on behalf of Cabela's) called using an ATDS, (2) on the person's cellular telephone number, (3) for the purpose of selling Defendant's products and services, and (4) for whom Defendant claims it obtained prior express consent in the same manner as Defendant claims it supposedly obtained prior express consent to call the Plaintiff.

(D.N. 1, PageID # 12)

Cabela's argues that since this definition "is limited to calls made for the 'purpose of selling Defendant's products and services,'" and since Eldridge claims to have received debt-collection calls only, Eldridge is not a typical class member. (D.N. 23, PageID # 213) Ordinarily, Cabela's would be correct. But Eldridge maintains that this problem is the result of a "drafting error" (D.N. 22, PageID # 188), which Cabela's does not challenge. (D.N. 23, PageID # 214). The Court notes that Eldridge's "Pre-recorded No Consent Class" contains no "products and services" language. (D.N. 1, PageID # 16–17) Absent the "products and services" language in the "Autodialed No Consent Class," the "Autodialed No Consent Class" definition appears adequate. Accordingly, the Court will grant Eldridge fourteen days within which to file an amended complaint in order to remedy the drafting error.[5] *See Feuerstein v. Simpson*, 582 F. App'x 93, 97 n.3 (3d Cir. 2014) ("[C]ourts have consistently held that leave to amend may be granted without a formal motion.").

---

[5] Although not raised by Cabela's, the Court finds another apparent drafting error in Eldridge's complaint. Eldridge claims that by making "unsolicited telephone calls to Plaintiff and members of the Pre-recorded No Consent Class's cellular telephones using a pre-recorded voice, Cabela's violated 47 U.S.C. § 227(b)(1)(B)." (D.N. 1, PageID # 16–17 (emphasis added)) The provision cited, however, concerns "residential telephone line[s]" only (i.e., landlines). 47 U.S.C. § 227(b)(1)(B). At issue in this claim are calls members received on their cellular telephones.

## V.    Conclusion

For the reasons explained above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1) Cabela's motion to stay proceedings (D.N. 19) is **DENIED**.

(2) Cabela's motion to dismiss and to strike class allegations (D.N. 20) is **GRANTED IN PART AND DENIED IN PART.**  The motion to dismiss is **DENIED.**  The motion to strike is **DENIED WITHOUT PREJUDICE** as to Eldridge's "Autodialed No Consent Class."  The motion to strike is **GRANTED** as to Eldridge's "Autodialed Stop Class" and "Pre-recorded Stop Class."

(3) Eldridge shall have **fourteen (14) days** from the date of entry of this Order within which to file an amended complaint correcting the definition of the "Autodialed No Consent Class."

September 28, 2017

**David J. Hale, Judge**
**United States District Court**